AMERICAN EXPRESS COMPANY, A Corporation,

*vs.*

# HOWARD P. TERRY.

*Injuries received while endeavoring to rescue others: mere fact going into danger to save lives not evidence of contributory negligence. Automobiles: right to use; leaving unat- tended on streets. Rulings of courts: immaterial errors.*

Automobiles and motor trucks are lawful means of convey- ance, and have the right to use the streets, but such use should be accompanied with such a degree of prudence in management, and consideration for the rights of others, as to be consistent with their safety.                                        pp. 260-261

While it is not *per se* negligence to leave an auto truck unat- tended in a public street, in so doing it is the duty of the one in charge to exercise such care as a person of ordinary prudence would exercise in like circumstances.                        p. 261

A person who incurs danger and is injured in attempting to save human life is not guilty of contributory negligence unless his conduct is such as to amount to rashness entailing almost certain injury.                                              p. 262

Where the plaintiff had seen a delivery motor truck, unat- tended and moving down grade at three or four miles an hour, in a direction where he deemed it certain to injure men work- ing in the street, and had attempted to reach up and steer the truck away from the place of danger, and in so doing was in- jured, it was: *Held,* that he was not guilty of contributory negligence, as a matter of law, so as to prevent his recovery of damages from the company owner of the truck.              p. 263

Errors in the rulings of the trial court are not ground for a reversal, where they are immaterial, and it does not appear that any real injury resulted therefrom. p. 264

*Decided May 5th, 1915.*

Appeal from the Superior Court of Baltimore City. (BOND, J.)

The plaintiff, seeing a delivery truck of the defendant corporation, unattended, moving down grade at three or four miles an hour, in a direction where he deemed it apt to imperil human lives; attempted to get on the truck and guide it to safety; in so doing he was injured by being crushed between the truck and a trolley pole; in an action for damages against the company, he recovered a verdict and judgment for $500. From such judgment the defendant appealed.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, URNER and STOCKBRIDGE, JJ.

*Floyd Johnson Kintner* and *John Philip Hill* (with whom were *Hill, Ross & Hill* on the brief), for the appellant.

*Robert J. Gill* and *L. Wethered Barroll,* for the appellee.

BURKE, J., deliverd the opinion of the Court.

This is the defendant's appeal from a judgment for five hundred dollars recovered against it in the Superior Court of Baltimore City in an action for personal injuries alleged to have been sustained by the plaintiff, Howard P. Terry, through the negligence of the defendant. The facts are unusual, but the legal principles which should control the case are well settled. The plaintiff offered evidence tending to prove the following facts: That on the 13th day of March, 1914, whilst he was crossing the intersection of Franklin street and Park avenue, in Baltimore City, he noticed an

electric truck running west on the north side of Franklin street with no one in control. This truck was owned by the defendant, and was used by it in its business of transporting and delivering articles in the city. At the time his attention was attracted to the truck it was running at the rate of three or four miles an hour, and it increased its speed until the time of the happening of the injuries complained of. He ran to the truck, got hold of the steering wheel and attempted to stop the machine, and was injured. The circumstances under which he was injured and the reasons which induced him to intervene to stop the truck are fully stated in his testimony, from which we insert the following quotation: "I had started across the intersection of Park avenue and Franklin streeet, and had gotten about halfway across Franklin street and got on Franklin street; I was not noticing anything in particular, but I did glance up and saw an automobile coming down the street, an automobile truck; I looked more closely and I saw the truck did not have any driver; I had noticed before going into breakfast that morning, also when I came out, there were wagons on the north side of Franklin street and men just behind them; I instantly thought if that car went the way it was going it certainly was going right into these wagons and would hit the wagons and injure the men and horses and smash up the wagons; my idea at once was to divert the car so as to prevent that; I ran for the car and reached up for the steering wheel with my right hand and got it, and tried to get hold with my left hand, but could not; I thought I could steer the car north up Park avenue, but I found it was going a little too fast, and by the time I had got halfway over Park avenue I found I could not do that; I then endeavored to run into the brick wall at the northwest corner, realizing at the time this would not injure anyone, and I had no idea certainly I would have injured myself, I could not see how I could; it happened that the front left wheel of the truck struck that rounded curve, throwing my plans all out. I turned the car so the back wheel came around this way and threw

me and the car over against the pole, and the post caught
me right here (indicating) and the car caught me right here
(indicating), and the distance between the post and the car
was lessening all the while, and as it came closer it brought
me around this way (indicating) and I was jammed in about
as small a place as anybody could be; as far as I know, I
retained hold of the steering wheel; that's about all I re-
member until being carried up the steps of the doctor's
house and I came to, and then went to the Y. M. C. A. and
was attended there by Dr. Abercrombie." That his pri-
mary purpose, as he testified, in attempting to stop the truck
was to save the lives of the men working on the street, and
if the truck had not been diverted it would probably have
crashed into the wagons. He further testified that at the
time he intervened the motor power of the truck was turned
on; that he could not say whether he turned the current on
in attempting to stop the truck, but if he did it was unin-
tentionally done; that he did nothing to accelerate the mo-
tion of the truck. The plaintiff was severely and painfully,
but not permanently, injured. He testified that he had
operated a gas truck; that he never ran an electric one, but
in steering there is no difference in a gas and an electric
truck; that he was unable to get in the truck because of
certain obstructions, and was unable to turn the truck to the
south side of Franklin street or up Park avenue for reasons
which he gave to the jury, and that he interfered "to save
life and property."

Charles V. Milholland, an experienced automobile dem-
onstrator, who was familiar with electric trucks and had
operated them, testified that in order to stop an electric truck
and insure its remaining stationary, the driver "should close
his lever and put on his foot brake. Q. Does that stop the
motor and the electric current? A. Yes; absolutely; if he
takes it off all points. Q. I understand that in a gasoline
truck you can leave the motor go and in an electric truck you
have to stop the motor; that is my understanding of the
difference between the two kinds of trucks? A. In the elec-

tric truck if the switch is on and the brake is on, if the brake is sufficient to hold the point at which that lever is set, the car will not move, but it will burn out the points; if you have enough power to overcome your brakes the car will move, otherwise the points will burn."

Julius J. Small, the driver of the defendant's truck, testified that the truck was in good condition, and that he had examined it that morning before taking it out of the garage; that the second stop he made was to deliver a package at 114 W. Franklin street; that he threw off the power and closed down the switch. He said: "I was in the gutter; I had the car in the gutter; that the front wheels were in the gutter, the back part was out of the gutter; now the gutter at that point is curbed; it was about that high at the time (indicating) and I had my wheels turned in part of the way first, as the law requires when you stop on a hill; just about then, as I stated before, the car started off, and as the lady told me I dropped everything and run; it was moving very slowly, and I happened to look at the car and at the same time I seen the gentleman run across the street who I afterwards learned was Mr. Terry; he looked to me as though he come from the southwest corner of Franklin street across, and as I jumped on the car Mr. Terry had hold of the car at the same time; he had one hand up on the wheel and one foot on the hub, reaching for the dashboard; he was slipping off the wheel, because he could not ride the wheel; the wheel had the speedometer on which registers the mileage and he was trying for that, which he could not reach; just as the car hit the post, that is the trolley pole, I was on the seat and backed away that quick, and naturally Mr. Terry was in between the post and the car." That there was a "very slight grade" from 114 W. Franklin street to the place where the plaintiff was injured.

On cross-examination, he testified as follows: "Q. Won't you explain to the jury why if the wheel was turned in at that angle with no current on the car running it, that car would continue that distance at that rate of speed and you

running hastily after it; was it possible for that car to run in that way simply from its own momentum? A. It was, yes; except from power. Q. Without power? A. Without power. Q. With the brakes on? A. I adjusted the brakes when I got off the car. Q. Would it have gone that way with the brakes on without power? A. No; it would not. Q. Then the brakes could not have been on? A. The brakes were on when I left the car. Q. When the car was running that way there could not have been any brakes on? A. After I got on the car, at 128, I found the brake was off. Q. Then you had not put it on? A. I had put it on. Q. You hadn't properly put it on? A. I had properly put it on."

The facts stated are sufficient to dispose of the main legal questions presented by the record.

At the conclusion of the whole case the Court granted the plaintiff's third and fourth prayers. The fourth prayer was the usual damage prayer, and the third prayer is here transcribed: "If the jury find from the evidence that the defendant corporation negligently permitted its motor delivery truck to drive itself at a *great rate* of speed with no one in charge of the engine or steering apparatus thereof through the street in the City of Baltimore in such a manner as to endanger the *lives and property* of persons on the street, and if because of such conduct on the part of the defendant corporation, the plaintiff while acting in a reasonably prudent and careful manner, sustained injuries, then their verdict must be for the plaintiff."

It granted the defendant's sixth, eighth and eleventh prayers and its ninth prayer was conceded. These prayers are as follows:

"*6th*—The defendant prays the Court to instruct the jury that if they believe from the evidence that the defendant's servant, in charge of defendant's electric truck, drove said truck to a point on the north side of Franklin street opposite the house known as number 114 West Franklin street; that said servant brought said truck to a stop at the point

aforesaid, near the curb; that said servant turned off the
current and set the brakes of said truck as careful and pru-
dent persons usually do; that said servant in pursuance of
his duty left said truck and entered the house aforesaid to
deliver a package; that in his absence, said truck, without
the fault of defendant or defendant's servant, began to move
west down Franklin street toward Park avenue; then there
is no evidence of negligence on the part of the defendant or
the defendant's servant, and the verdict of the jury must be
for the defendant."

"*8th*—The defendant prays the Court to instruct the jury
that unless they find from the evidence that the defendant's
servant in the management of the truck failed to use such
diligence and care as prudent and discreet persons would
exercise on a like occasion with such truck, then the plain-
tiff is not entitled to recover and the verdict of the jury must
be for the defendant."

"*9th*—The defendant prays the Court to instruct the jury
that if they find from the evidence that the plaintiff failed
to exercise such care and prudence as a discreet person would
have exercised under all the circumstances, then the plaintiff
is not entitled to recover, even though the defendant was
negligent, provided the defendant could not have avoided
the plaintiff's negligence."

"*11th*—The defendant prays the Court to instruct the
jury that if they believe from the evidence that the plaintiff
interfered with the defendant's truck for the purpose of
securing a reward for his services and that at the time of
such interference he had no reasonable ground to believe
that there was immediate danger to human life, then such
interference constituted contributory negligence, and the
verdict of the jury must be for the defendant."

The granted prayers, in our opinion, properly declared the
law applicable to the facts and fairly submitted the whole
case to the jury.

Automobiles and motor trucks are lawful means of con-
veyance, and have rights to the use of the public streets and

highways, but their use should be accompanied with that degree of prudence in management and consideration for the rights of others which is consistent with their safety. It is not *per se* negligence to leave an auto truck unattended in a public street. It is the duty of one who leaves a machine unattended in the public street to exercise such care as a person of ordinary prudence would exercise under the circumstances. With respect to this kind of truck, the precautions to insure the safety of persons and property on the street are those testified to by the witness Milholland. If the driver failed to exercise due care, it can not be doubted that he was guilty of negligence, and under the circumstances testified to by the plaintiff the jury may well have inferred that the driver Small had been careless in the management and control of the truck. The plaintiff's evidence was legally sufficient to raise a *prima facie* presumption of negligence, which the defendant was bound to rebut or overcome. The evidence precludes the theory that the truck was started because of the intervening act of some third party, and had the machine been in good order and the current turned off and the brake properly applied, it is difficult to see how it could have been found running down the street in the manner described by the witnesses. The testimony on the part of the plaintiff, under the principles declared in *Howser* v. *C. & P. R. R. Co.,* 80 Md. 146, and *Benedick* v. *Potts,* 88 Md. 52, was sufficient to take the case to the jury upon the question of the defendant's negligence. In *Howser's case, supra,* the Court adopted the rule stated in the case of *Scott v. London Dock Co.,* 3 Hurl. & C. 596: "There must be reasonable evidence of negligence. But where the thing is shown to be under the management of the defendant or his servants, and the accident is such as, in the ordinary course of things, does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from want of care."

Did the evidence tend to show that the negligence of the plaintiff was the proximate cause of the injury? It was contended for the defendant that the plaintiff was not justified in his attempt to stop the truck, and that his intervention constituted contributory negligence; that the lower Court should have so decided as a *matter of law*, and withdrawn the case from the jury by granting the defendant's third, fourth and fifth prayers.

In a full note in 4 *American & English Annotated Cases*, 925, to the case of *Mobile & Ohio R. R. Co.* v. *Ridley*, 114 Tenn. 727, in which many of the cases on this subject are cited and reviewed, it is stated that: "The well established rule is, as laid down in the reported case, that a person who incurs danger and is injured or killed in attempting to save human life is not guilty of contributory negligence, unless his conduct is such as to amount to rashness entailing almost certain injury." In support of this statement of the rule the author cites many cases from the State courts. In *Bracey* v. *North Western Improvement Company*, 41 Mont. 338, *s. c.* 109 Pac. Rep. 706, the Court said: "The rule rests upon the principle that it is commendable to save life, and, though a person attempting to save it voluntarily exposes himself to danger, the law will not readily impute to him responsibility for an injury received while doing so. In such cases the incurring of the danger is not *per se* negligence, and the question whether there was contributory negligence is ordinarily to be answered by the jury upon proof of the circumstances surrounding the attempt to rescue— such as the alarm, excitement, and confusion usually present, the uncertainty as to the means to be employed, the promptness required, and the liability to err in the exercise of judgment as to the best course to pursue—and great latitude of judgment must be allowed to one who is impelled by the dictates of humanity to decide and act in the face of emergencies."

In *Illinois Central Railroad Co.* v. *Siler*, 229 Ill. 390, the defendant company was charged with negligence in starting

a fire on its own right of way. The fire spread to the premises of the plaintiff's intestate, who was burned to death while exercising due care in an effort to extinguish the fire, and protect her dwelling house, whose destruction was threatened. It was insisted that the injury to the decedent was not the proximate result of the negligence charged. This contention was not sustained. In a strong opinion the question of proximate cause was clearly discussed, and it was held that "the proximate cause of an injury is ordinarily a question of fact to be determined by the jury from a consideration of all the attending circumstances." In the course of the opinion the Court said: "It is true that in this case the voluntary act of the decedent intervened between the negligent act of the appellant in setting out the fire and the injury occasioned by the burning of decedent. But this act was one of the intervening causes which the appellant with reasonable diligence might have foreseen. It was a consequence of the wrongful act of appellant which it ought to have anticipated. It was not a new and independent cause intervening between the wrong and the injury, or disconnected from the primary cause and self-operating, but was itself the natural result of appellant's original negligence."

The same rule, both as to proximate cause and contributory negligence in cases of this kind, was announced by this Court in *Md. Steel Co.* v. *Marney,* 88 Md. 482.

The Court refused to take the case from the jury, and submitted to the finding of the jury the question of the defendant's negligence and the plaintiff's contributory negligence, and also the further question as to whether the running of the machine under the circumstances mentioned endangered the lives and property of persons on the street. We find no error in the refusal of the defendant's seventh and tenth prayers or in the overruling of the two special exceptions. These prayers are open to several objections, but it is sufficient to say that the questions proposed to be submitted were covered by the granted prayers. The special exceptions to the granting of the plaintiff's third prayer

were based on two grounds : *First,* that there was no evidence that at the time of the accident the truck was running at a "great rate of speed" ; and *secondly,* that there was no evidence that "the lives and property of persons on that street" were endangered.   There was sufficient evidence to have submitted both of these questions to the jury.   The machine was running at a speed of three or four miles an hour when the plaintiff first noticed it, and this speed was afterwards increased.   The adjective "great" was evidently used in a comparative sense as opposed to slow or moderate, and not in the sense of unusual rapidity.

During the course of the trial, the defendant reserved nine exceptions to rulings on evidence.   We do not consider it necessary to discuss these exceptions.   The Court will not reverse a judgment unless it clearly appears that there has been a concurrence of error and injury in the action of the trial Court.   It frequently happens in the trial that the Court commits some errors, but they do not constitute ground of reversal unless this Court can see that some real injury has thereby resulted.   In this case the plaintiff sustained serious injury, but the verdict was small, and we do not find, after a careful consideration of the exceptions and the whole evidence contained in the record, any reversible error in any of the rulings.

> *Judgment affirmed, the appellant to pay the costs.*